UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AVA CLARK,                                           :

                              Plaintiff,              :          OPINION AND ORDER

              -v.-                                   :          19 Civ. 264 (GWG)

                                                    :

ANDREW SAUL,[1]                                      :
Commissioner of Social Security                     :

                              Defendant.            :
------------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

       Pro se plaintiff Ava Clark seeks review of the Commissioner of Social Security's denial

of her application for disability insurance benefits.  The Commissioner now moves for judgment

on the pleadings.[2]  For the reasons stated below, the Commissioner's motion is granted.

I.  BACKGROUND

       A.  Procedural History

       On April 25, 2012, Clark filed an application for social security disability benefits with

an alleged disability onset date of December 31, 2007.  SSA Administrative Record, filed May 1,

---

       [1] Andrew Saul became the Commissioner of Social Security on June 17, 2019, and is
substituted as defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

       [2] See Motion for Judgment on the Pleadings, filed July 1, 2019 (Docket # 13);
Memorandum of Law in Support of Motion for Judgment on the Pleadings, filed July 1, 2019
(Docket # 14) ("Def. Mem."); Letter from Ava Clark, filed July 3, 2019 (Docket # 16)
("Letter"); Notice of Motion to Oppose Commissioners Motion, filed July 11, 2019 (Docket
# 18); Declaration in Opposition to Defendant's Motion for Summary Judgment, filed July 11,
2019 (Docket # 19) ("Clark Opp."); Reply Memorandum of Law in Support of Motion for
Judgment on the Pleadings, filed September 24, 2019 (Docket # 20) ("Reply"); Second Reply
Memorandum of Law in Support of Motion for Judgment on the Pleadings, filed Oct. 25, 2019
(Docket # 23) ("2d Reply"); Declaration in Opposition to the Defendant's Second Reply
Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment on the
Pleadings, filed Nov. 6, 2019 (Docket # 25) ("2d Opp.").

2019 (Docket # 9) ("R.") at 169. [3] Her claim was denied on June 28, 2012. R. 67. On August 1, 2012, Clark requested a hearing before an administrative law judge ("ALJ"). R. 72-74. The hearing took place on May 29, 2013, before now-retired ALJ Lebron. R. 28. On December 13, 2013, the ALJ denied Clark's claim in a written decision. R. 9. On February 17, 2014, Clark requested review of the ALJ's decision by the Appeals Council. R. 7-8. On March 12, 2015, the Appeals Council denied the request for review. R. 1-6. On March 24, 2015, Clark filed a civil action seeking review of the Commissioner's decision. R. 641, 747.

On June 13, 2016, United States Magistrate Judge Henry Pitman issued a Report and Recommendation that Clark's case be remanded to the Commissioner for further administrative proceedings. R. 744-89; Clark v. Colvin, 2016 WL 11483854 (S.D.N.Y. June 13, 2016). Judge Pitman found that the ALJ failed to adequately develop the record. R. 781-85; Clark, 2016 WL 11483854, at *15. Specifically, Judge Pitman found that the ALJ should have sought additional records from Dr. Irene Weiss in light of a letter from Clark's attorney asking for assistance obtaining those records. R. 782; Clark, 2016 WL 11483854, at *13. United States District Court Judge Crotty adopted the Report and Recommendation in full on September 7, 2016. R. 733-41; Clark v. Colvin, 2016 WL 4679730 (S.D.N.Y. Sept. 7, 2016). Following remand on January 12, 2017, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings. R. 726.

On December 5, 2017, ALJ Michael Stacchini held a hearing during which Clark testified. See R. 697-710. During the hearing, the ALJ said he would subpoena Dr. Weiss for

---

[3] According to Clark, she applied for Social Security on May 24, 2012. Clark Opp. at *1. (We use an asterisk (*_) to show the page numbers of plaintiff's filings as shown on the Court's electronic docket system.)

Clark's records.  R. 709.  Another hearing was held on April 10, 2018, at which Clark again testified.  See R. 681-96.  The ALJ confirmed that he had all of Clark's records, R. 691-94, but the hearing was adjourned because the medical expert was no longer available, see R. 694-95.  A final hearing took place on August 23, 2018.  R. 657-80.  Clark and Dr. Buckwalker, a medical expert ("ME"), testified.  R. 658-59.  In a written decision on October 18, 2018, the ALJ again denied Clark's claim.  R. 638-49.  On January 9, 2019, Clark filed this action.

B.  Medical Evidence

The Commissioner has provided a summary of the medical evidence contained in the administrative record.  See Def. Mem. at 4-12.  While Clark has submitted additional evidence in the briefing of this motion, she has not objected to this summary.  Having examined the record, the Court adopts the Commissioner's summary as accurate and complete (with the exception of the newly-submitted evidence) for the purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case as well as the newly-submitted evidence in section III below.

C.  The Hearings Before ALJ Stacchini

At the hearing held on December 5, 2017, Clark was not represented.  See R. 701.  She testified that prior to being diagnosed with breast cancer in 2011, she only saw Dr. Velez-Phillips and Dr. Weiss.  R. 707-09.  Clark stated, "I hadn't even been referred to orthopedic yet." R. 709.  Clark also testified that the records prior to 2010 were complete, apart from the records from Dr. Weiss.  See R. 708.  Dr. Weiss began treating Clark in September of 2010 while Dr. Weiss was working at the Outpatient Clinic at the Westchester Medical Clinic.  R. 702-03.  The ALJ said he would subpoena Dr. Weiss's records and get a medical expert ("ME") for a supplemental hearing.  R. 709.

At the April 10, 2018, hearing, Clark testified that the clinic sent her medical records from 2010 to 2014 from the endocrinology department where Dr. Weiss was the attending physician. R. 686. The ALJ confirmed that the records he had likewise went back to 2010. R. 686-93. Clark testified that Dr. Weiss was treating her for "hypercalcemia, hyperparathyrodism, high levels of calcium in [her] blood." R. 689. Clark testified that she was referred by her primary care physician for minor hypercalcemia and went to Dr. Weiss in November 2010. R. 691-92. Dr. Weiss was not treating Clark for arthritis. R. 692. Clark returned to Dr. Weiss in January 2011. Id. The ALJ confirmed that he had "all the medical evidence for the period prior to December 2010." R. 694. Because the ME could not be reached, the hearing ended. R. 693-95.

At the August 23, 2018, hearing, Clark testified that she did not "have any additional records prior to 2010." R. 662. She did, however, submit current medical records regarding her knee. Id. The ME, who is board-certified and specializes in family medicine, then testified. R. 663. He testified that, prior to December 31, 2010, he did "not have an opinion as to if [Clark had] any impairments. I did not find any in this record that I found to be significant." R. 666. The ME did not "see any physical impairment findings in this time period that would speak to the arthritis," "it was simply listed historically." R 667. Clark was also diagnosed with high blood pressure, gastroesophageal reflux disease ("GERD"), obesity, and hypercalcemia. Id. The ME did not find that these medically-determinable impairments would "have more than a minimal effect on [Clark's] ability to perform basic work activities." R. 667-68. Based on his review of the records from the primary care physician, endocrinologist, and nurse practitioners for 2009 and 2010, the ME stated that Clark had "high blood pressure, obesity, hypercalcemia, GERD" and "looking at these diagnoses and looking through the records, I did not find physical

or exam evidence or otherwise objective evidence that would substantiate what I would considered to be a severe medical impairment." R. 668. The ALJ noted that there were no records for 2007 and 2008. Id.

The ME testified that after December 31, 2010, Clark had severe medical impairments, which included breast cancer, cervical radiculopathy, lumbar radiculopathy, adhesive capsulitis in the left shoulder, peripheral neuropathy, and a Baker's cyst in her knee. R. 669. However, none of these impairments "relate[d] back" to before December 31, 2010. R. 668.

Clark then testified that between 2007 and the end of 2010 she lived in an apartment with her mother-in-law and two daughters. R. 671. At the time, Clark's daughters were in their early 20s and attending school and her mother-in-law did not work. Id. Clark's sole method of transportation was driving her car. Id. Clark testified that she could do chores such as her laundry in the apartment complex, go food shopping at ShopRite, make the beds, clean the bathroom, and wash the dishes. R. 672. Clark would also go to the movies with friends and go dancing at clubs. Id. Clark also testified to preparing meals. R. 673. She participated in Weight Watchers and would walk about two blocks. R. 674-75.

Clark testified that prior to 2011 she was diagnosed with high blood pressure, GERD, hypercalcemia, and obesity. R. 675. Dr. Velez-Phillips was treating Clark with high blood pressure medication and Vitamin D for these conditions but "that was pretty much it back then." Id. Clark also saw Dr. Weiss during that time but "it was more or less the Vitamin D to help the bone absorb the calcium that was excessive in my blood." Id. Clark's only symptoms during that time were fatigue and knee pain. See R. 676. Clark was taking over-the-counter paid anti-inflammatory for the swelling in her knee. Id. At the time, Dr. Velez-Phillips was not treating Clark for arthritis and she was referred to orthopedics around the same time she developed breast

5

cancer.  R. 677.

Clark testified that prior to the breast cancer diagnosis she could not work.  R. 676.  Clark worked at Hudson cardiology for a month but left "because [she] had to walk up two flights of stairs and [she] had to carry charts, retrieve them and the file them."  Id.  Her right knee swelled to the point where she couldn't stand and therefore she was not looking for work.  Id.  Clark testified she currently works for five hours a day, three days a week, but she has "a hard time" because her knee bothers her, she doesn't sleep well, she's on many medications which sometimes makes her forgetful, and she has dry mouth.  R. 678.

D.  ALJ Stacchini's Decision

ALJ Stacchini concluded that no impairment or combination of impairments existed prior to Clark's date last insured — December 31, 2010 — that rendered her disabled.  R. 649.  In his decision, the ALJ used the five-step sequential evaluation process described in the Social Security Regulations for determining whether an individual is disabled.  R. 642-49; see also 20 C.F.R. §§ 404.1520(a); 416.920(a).  First, the ALJ found that Clark met the insured status requirements of the Act through December 31, 2010.  R. 644.  Next, the ALJ found that, although Clark worked after the alleged disability onset date of December 31, 2007, Clark did not engage in substantial gainful activity between the alleged onset date and the date last insured, December 31, 2010.  Id.  The ALJ then found that Clark had the following medically determinable impairments: hypercalcemia, hypertension, GERD, and obesity.  Id.  The ALJ concluded that none of these impairments, or any combination of impairments, significantly limited Clark's ability to perform basic work-related activities for 12 consecutive months through the date last insured.  Id.  Therefore, the ALJ determined that Clark did not have a severe impairment or combination of impairments.  Id.

The ALJ followed a two-step process to assess Clark's symptoms and determine that her impairments were not severe.  R. 645.  The first step requires the ALJ to consider whether there is an underlying medically determinable physical or mental impairment, that can be shown through medically acceptable clinical or laboratory diagnostic techniques, that could reasonably be expected to produce Clark's symptoms.  Id.  Once an impairment is shown, the ALJ evaluates the intensity, persistence, and limiting effect of Clark's symptoms to determine the extent to which they limited her functionality.  Id.  If statements regarding intensity, persistence, or the functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider other evidence in the record to determine if Clark's symptoms limit her ability to do work-related activities.  Id.

The ALJ first noted that, upon reviewing the record for the relevant time period between December 31, 2007 and December 31, 2010, there were no medical records for 2007 and 2008.  Id.  The ALJ reviewed and summarized Clark's medical history, noting that while Clark's primary care physician, Dr. Velez-Phillips, noted Clark's past medical history of osteoarthritis in her knees and lower back pain, there was no evidence in the record that Clark was treated by anyone for these conditions during the relevant time period.  Id.  Dr. Velez-Phillips prescribed Tylenol as a substitute for the ibuprofen Clark was taking for back pain.  R. 646.  Dr. Velez-Phillips diagnosed Clark with hypercalcemia in 2010, see R. 646, 647, and referred Clark to an endocrinologist, R. 647.  The endocrinologist, who Clark saw on November 17, 2010, also diagnosed hypercalcemia.  Id.  When Clark returned to Dr. Velez-Phillips on December 2, 2010, Clark was diagnosed with hypercalcemia and GERD.  Id.  The report notes that a bone density scan was scheduled for December 10, 2010, but the record did not contain the results.  Id.  The ALJ also summarized Clark's living conditions and lifestyle during the relevant period, noting

that Clark took over-the-counter medications for pain but did not receive any treatment for osteoarthritis.  Id.

The ALJ noted that the ME had testified that Clark did not suffer any significant impairments during the relevant period and that there were no severe impairments that could cause any more than a minimal effect on Clark's ability to perform basic work activities prior to December 31, 2010.  R. 647-48.  The ME also testified that none of Clark's subsequent medical conditions related back to prior to December 31, 2010.  R. 648.  The ALJ afforded the ME's opinion "great weight" because Clark's medically determinable impairments were not diagnosed until after December 31, 2010, and records prior to December 31, 2010, showed normal examinations and Clark "engaged in a full range of daily activities" that "contradict her allegations of being unable to work."  Id.  The ALJ acknowledged that generally the opinions of non-examining sources are given less weight than a treating source.  Id.  However, in this instance, the ME was an expert in the field who listened to Clark's testimony and reviewed her record, he had extensive understanding of social security disability programs and the evidentiary requirements, his opinion was well supported by objective medical evidence, and his opinion was detailed and referred to the treating record.  Id.  Furthermore, the ALJ noted that the other medical opinions in the record were rendered after the date last insured and did not relate back to the relevant time period.  Id.  Therefore, the ALJ did not give any weight to Dr. Walsh's opinion covering January 2012 forward, Dr. Johnston and Dr. Pelczar-Wisener's assessments, or to Dr. Velez-Phillips's 2012 assessment.  Id.

The ALJ also found that while Clark's medically determinable impairments "could have been reasonably expected to produce the alleged symptoms . . . [Clark's] statements concerning the intensity, persistence and limiting effects of these symptom are not entirely consistent with

the medical evidence and other evidence in the record." R. 648-49. Accordingly, the ALJ ruled

that Clark was not disabled from her alleged onset date through the date last insured.

II. APPLICABLE LAW

    A. Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d

370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ."). "Even where the administrative record may also adequately support contrary

findings on particular issues, the ALJ's factual findings must be given conclusive effect so long

as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)

(per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court

finds substantial evidence to support the Commissioner's final decision, that decision must be

upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v.

Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126

(2d Cir. 1990)).

Importantly, it is not a reviewing court's function "to determine de novo whether [a

claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal

quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir.

2012). Rather, substantial evidence is "more than a mere scintilla." Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

accord <u>Greek</u>, 802 F.3d at 374-75; <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008). "It means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (citation and internal quotation marks omitted). The "threshold for such evidentiary sufficiency is not high." <u>Id.</u> The Second Circuit has held that "[t]he substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise.</u>" <u>Brault v. Soc. Sec. Admin. Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." <u>Johnson</u>, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

      B. <u>Standard Governing Evaluations of Disability Claims by the Agency</u>

      The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); <u>accord</u> <u>id.</u> § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." <u>Id.</u> §§ 423(d)(2)(A), 1382c(a)(3)(B).

      To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id.§§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See id. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to

his or her age, education, and work experience, permits the claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

We construe Clark's filings as arguing that (1) the ALJ's decision was not supported by substantial evidence and (2) the case should be remanded to the agency to consider new evidence Clark has presented.

A.  Whether Clark Was Disabled Prior to December 31, 2010

The ALJ found that Clark did not suffer from a medically determinable impairment prior to December 31, 2010, R. 649, and therefore ended his analysis at "step two," see R. 643 — that is, the assessment of whether any of the claimed impairments were "severe," see 20 C.F.R. § 404.1520(a)(4)(ii).  Because the ALJ found that Clark did "not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement," the ALJ found that Clark was not disabled.  See R. 644.  Clark challenges the ALJ's conclusion on the grounds that the ALJ improperly weighed the ME's opinion, that the evidence demonstrated the progression of her conditions, and that the ALJ did not consider the combination of Clark's impairments.  Letter at *1; Clark Opp. at *2-4, 8; 2d Opp. at *4.  We address each of these arguments next.

1.  Weight Given to the ME's Opinion

Clark claims that the ALJ "disregarded and mischaracterized evidence that clearly states

my disability. I don't feel he properly considered report from doctor's [sic] that have and do still treat me." Letter at *1. Clark appears to be invoking the "treating physician rule."

Under the so-called "treating physician" rule, in general, the ALJ must give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Treating sources, which includes some professionals other than physicians, see id. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." Id. §§ 404.1527(c)(2), 416.927(c)(2). The Second Circuit has summarized the deference that must be accorded the opinion of a "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . . An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error. Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).

Accordingly, the Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; accord Estrella, 925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve." (citation omitted)). Finally, a "slavish recitation of each and every factor [listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

In this case, the ALJ noted that there were no medical records for 2007 and 2008. R. 645. He also noted that Clark had a family history of breast cancer; received regular mammograms; and, during the relevant period, had several normal mammograms. Id. An

abnormal mammogram appears in the record in late 2010, R. 266, but Clark was not diagnosed with breast cancer until after her last insured date, R. 358, 361-63, 370. The ALJ described Clark's visits to Community Health, Hudson River HealthCare "for checkups, for cold and flu-like symptoms and for problems related to her weight." R. 645. The ALJ recognized that progress notes included a "past medical history section" that listed a history of "osteoarthritis of knees/Lower back pain" but that the record contained no evidence that Clark was treated for these conditions during the relevant period. Id. After a more detailed review of Clark's medical history, the ALJ described Clark's testimony as it related to the period from 2007 to 2010 and noted the following:

> [Clark] said she was independent with personal care. She said she was able to drive. She would shop for food, do her laundry, and clean such as make the beds, clean the bathroom and clean dishes. She enjoyed cooking. She socialized with friends occasionally going to clubs and dancing. She received conservative care prior to her date last insured. She took medication for her high blood pressure and vitamin D without side effects. Although she testified that she took over-the-counter medications for pain, she did not receive any treatment for osteoarthritis or her back conditions prior to the date last insured.

R. 647.

The ALJ then turned to the testimony of the ME who stated "there is sufficient objective medical evidence to determine that prior to the date last insured on December 31, 2010, there were no significant impairments" and there were no severe impairments that would cause "any more than minimal effects on the claimant's ability to perform basic work activities." R. 647-48. Noting that "the opinion of a non-examining source is entitled to less weight than the opinion of a treating or examining source [and] [s]uch an opinion can never be given controlling weight" the ALJ nevertheless afforded the ME's opinion "great evidentiary weight" because he was qualified, "reviewed the entire medical record," his opinion was "well supported by the objective

15

medical evidence," and "[h]e ably supported his opinion with detailed and extensive references to the treating medical record."  R. 648.

The ALJ also weighed the fact that the other medical opinions in the record "were rendered well after the date last insured and no physician related any reported limitations to the period prior to the date last insured."  Id.  Notably, a residual functional capacity assessment from Dr. Walsh covered only the period after January 2012, and the assessments from Dr. Johnston, R. 515-19; Dr. Pelczar-Wissner, R. 541-46; and Dr. Velez-Phillips, R. 460-67, also appear to cover only the 2012 time frame.[4]

Clark is not entitled to benefits unless she became disabled prior to her last date insured, which was December 31, 2010.  See Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989).  To show that she was disabled during the relevant time period — that is, between her onset date of December 31, 2007 and December 31, 2010 — we recognize that it is not necessary that she provide medical evidence contemporaneous with this time period.  As case law notes, it sometimes happens that a claimant "might . . .  satisf[y] his burden of demonstrating that he was continuously disabled . . . by means of evidence only from before and after [the relevant] period."  Id. at 39.

To show her condition, Clark relies heavily on medical records that post-date the relevant time period.  But for these records to provide substantial evidence of a disability during the

_____

[4] We note that these assessments are not consistent with each other.  Dr. Johnson did not foresee significant limitations, stating Clark would be limited to participation in treatment or rehabilitation for six weeks but would not be unable to work for more than six months, R. 517-18.  While Dr. Johnson listed Clark's prognosis as "fair," R. 473, Dr. Pelczar-Wissner listed many significant limitations and determined Clark was permanently disabled, R. 544-45.  A neurologist also determined Clark was "totally disabled" but that "[h]er limitations and functional disabilities are causally related to" a January 25, 2016, accident.  R. 1495.

relevant time period, the records must actually shed light on Clark's condition during that period. See, e.g., Flanigan v. Colvin, 21 F. Supp. 3d 285, 302 (S.D.N.Y. 2014) (denying benefits where "at best the evidence show[ed] that [plaintiff] experienced progressively worsening symptoms that eventually became disabling" after his date last insured); see also Behling v. Comm'r of Soc. Sec., 369 F. App'x 292, 294 (2d Cir. 2010) (summary order) (claimant's current condition not relevant because she "was required to demonstrate that she was disabled as of the date on which she was last insured" and "[a]ny new impairments are not relevant" (citations omitted)); Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs., 360 F. App'x 240, 243 (2d Cir. 2010) (summary order) (although record contained evidence of ailments prior to claimant's date last insured, "at no point [was] there any documented medical determination" that demonstrated he was per se disabled prior to that date). Here, none of the opinions Clark points to suggest any disabling condition during the relevant time period.

Because none of the opinions from treating physicians relate to the relevant time period, we do not find the "treating physician rule" to have been violated. The ALJ properly considered the evidence in the record, which demonstrates Clark's relatively unremarkable medical history prior to December 31, 2010. The evidence reflects only a few complaints by Clark during the relevant time period, R. 272 (elevated blood pressure); R. 282 (bronchitis); R. 284 (cough); R. 286 (same); R. 288 (congestion); R. 290 (flu-like symptoms); R. 292, 296 (burning in abdomen). These either resolved with time or were managed with medication. See, e.g., R. 266, 292-93 (Nexium for GERD); R. 296 (ibuprofen for back pain). Clark herself reported that she had no side effects from her blood pressure medication and vitamin D, that she was only taking over-the-counter medication for pain, and that she was not receiving treatment for osteoarthritis in her knees or back. R. 677. She also reported being independent. See R. 671-72. Because the

ME's opinion was based on and consistent with the medical evidence in the record, much of

Clark's own testimony, and testimony from other physicians did not apply to the period at issue,

the ALJ properly considered the ME's testimony and did not run afoul of the "treating physician

rule."

### 2. Progression of Clark's Condition

Clark claims "that from the onset date until now the records exhibits [sic] the progression

of the pre-existing impairments" and "all of my disabling condition are listed [in the Social

Security Blue Book]." Clark Opp. at *8. She also states that "all additional evidence is directly

connected to the onset exhibiting the progression of the pre-existing conditions." Letter at *2.

The question before the ALJ, however, was whether Clark was impaired from the claimed date

of onset until the date last insured. See generally 42 U.S.C. § 423(d)(1)(A) (defining "disability"

to mean in relevant part the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical . . . impairment" (emphasis added)). The fact that Clark's

current conditions may be listed in the Social Security Blue Book is irrelevant to this analysis.

There is no evidence that Clark's later impairments caused her to be unable to work

before December 31, 2010. Clark's medical evidence from the relevant time period supports a

single suggestion of back pain, see R. 296 (notes Clark was taking ibuprofen for back pain), and

does not indicate the development of breast cancer, see, e.g., R. 342 (January 2009 mammogram

results was normal). Clark was just beginning to see Dr. Weiss in the last few months of the

relevant period for hypercalcemia. See R. 233, 675, 1918. Clark's primary complaints were

fatigue and knee pain, which she was managing with over-the-counter medication. See R. 676.

Ultimately, the ALJ found that Clark "does not have an impairment or combination of

impairments that significantly limits his or her ability to perform basic work activities." R. 649.

18

This decision was based on the medical evidence that "consistently showed normal examination findings as well as her independent activities of daily living." Id. Thus, even if Clark's later conditions were physically present in some form during the relevant period, the ALJ could properly find that they did not impact Clark's ability to conduct basic work activities. See, e.g., Mauro v. Berryhill, 270 F. Supp. 3d 754, 763 (S.D.N.Y. 2017) ("the issue before the ALJ was not whether cancer was present prior to the last date insured but rather whether the cancer rendered her unable to work at that time."), aff'd, 746 Fed. App'x 83 (2d Cir. 2019).

### 3. The ALJ Considered the Combination of Clark's Impairments

Clark argues that the "combination of [her] impairments and how they [a]ffect me on a daily basis was not taken into consideration" by the ALJ. Clark Opp. at *3; see also Letter at *1. Clark's medical impairments can be divided into two categories: (1) those for which there is some evidence as to their existence prior to the date last insured — namely hypercalcemia, hypertension, GERD, and obesity, R. 644; and (2) those which were diagnosed after the date last insured — namely "[breast] cancer, osteoarthritis, lumbar radiculopathy, cervical radiculopathy, hernia, Bakers cyst, . . . and shoulder adhesive capsulitis," R. 648; see also, e.g., R. 1372-2163. Because there is no evidence that any of the impairments in the second category caused severe impairments to Clark before the date last insured, see section III.A.2 above, they were properly not considered as part of the combination of Clark's impairments. Thus, we review whether the ALJ properly determined that Clark's impairments of hypercalcemia, hypertension, GERD, and obesity were not severe. See R. 648, 667.

Under the Commissioner's regulations, an alleged impairment is "severe" only "if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1520(c). A "non-severe"

impairment is one that is "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1.[5] "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). Although "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work,'" Rosario v. Apfel, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12 (1987)), the ALJ must take into account the cumulative effects of ailments, including those that are non-severe. 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'"); accord Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995).

Here, the ALJ's conclusion that the conditions of hypercalcemia, hypertension, GERD, and obesity resulted in non-severe limitations is supported by the record. Certainly, there is

---

[5] "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Examples include

    (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
    (2) Capacities for seeing, hearing, and speaking;
    (3) Understanding, carrying out, and remembering simple instructions;
    (4) Use of judgment;
    (5) Responding appropriately to supervision, co-workers and usual work situations; and
    (6) Dealing with changes in a routine work setting.

Id.

evidence that Clark had a diagnosis of hypercalcemia, R. 300, 302, 307; hypertension, R. 304; GERD, R. 300, 302, 304, 306, 309, 312, 314, 316, 318, 320, 322, 324-25, 328-29, 341; and obesity, see, e.g., R. 300, 302, 304, 307, 328. There is also evidence that Clark had a past history of anemia, R. 298, 300, 326, 328, 330, 332-333, 336; osteoarthritis in the knees and lower back, R. 300, 302, 304, 306, 309, 312, 314, 316, 318, 320, 322, 324, 326, 328, 330, 332-333; and a cyst on her right finger which was surgically removed in 2005, R. 521-24. Nonetheless, no treatment of these conditions is recorded during the relevant time period.

Beyond these diagnoses and recorded history, however, there was virtually no evidence that these impairments caused more than a minimal effect on Clark's ability to perform basic work activities. The records the ALJ had for the relevant period mentioned that Clark was "doing well," R. 302, and that her pain rating was at zero, R. 302, 324, 334. The records also indicate that Clark was working or at least applying for a job, see R. 330, and that Clark did not have joint pain or swelling, see, e.g., R. 309 ("no joint tenderness or swelling"); R. 334 (same). A single record notes she had back pain, but that she was taking ibuprofen for it. R. 296.

Clark did report a "consistent ache" but it was noted that it could be relieved with "over the counter Motrin or Tylenol," R. 218. She also stated that she was able to go out alone, R. 212, and could "walk, drive, [do] some chores, socialize, read, [and] watch TV" on a daily basis, R. 219. Indeed, the record suggests Clark enrolled in and completed a course to be a certified nurse's assistant (or "CNA") during the time she claimed to be disabled. See, e.g., R. 33 (during the first hearing, Clark testified to going to school and receiving a certification for certified nursing in 2009); R. 200 (completed Certified Nursing/Home Health Aide course in 2009 and worked as a certified nurses aid in January 2010); R. 309 ("Work CPE"); R. 330 ("Here to complete work forms" and "Work forms completed"); R. 333 ("Work as CNA class to

21

begin next week. [Clark n]eeds CPE.").  She was also encouraged to exercise.  R. 275.

Clark testified that she could not work because of her osteoarthritis, R. 33-35, 37-39, 676, but that is unsupported by the record.  Clark reported that her osteoarthritis made it difficult to "stand, walk, or even sit as long as she used to" only beginning in May 2012 — not at any point prior to December 31, 2010.  R. 231.  Furthermore, a neurologist determined her to be "totally disabled" as of February 2016 because of "limitations and functional disabilities" that were "causally related to [a January 2016] accident."  R. 1495.

The Second Circuit has held that "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings."  Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).  In such circumstances, however, the "ALJ is nonetheless empowered to exercise discretion to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  Id. (citation and internal quotation marks omitted).  Where an ALJ rejects a claimant's testimony regarding the extent of pain as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell, 177 F.3d at 135.

Here the ALJ found "records consistently showed normal examinations with Clark denying symptoms on most occasions.  Moreover, prior to the date last insured, the claimant "engaged in a full range of daily activities, which included driving."  R. 648.  This "contradict[ed] her allegations of being unable to work."  Id.  Therefore, the ALJ could discount Clark's testimony.

Clark points to a number of items in the record that she claims support a finding in her favor. We will briefly address each. Clark points to a page of the record, R. 265, that she contends "gives a [sic] accurate timeline as to when my onset conditions [sic] took place, documented by Dr. Madeline Velez-Phillips," Clark Opp. *2. While the record refers to dates between December 1, 2007 and December 31, 2010, R. 265, it does not purport to describe Clark's condition during this time period. Rather, the document is merely a request for copies of records from Dr. Velez-Phillips for this period.

Clark draws the Court's attention to a set of records that she claims "documents treatment for osteoarthritis of the knees and the lower back." Clark Opp. at *2-3 (citing R. 265-333). These records document Clark's treatment with Dr. Velez-Phillips. While they contain a reference to "Osteoarthritis of knees/ Lower back pain" under "Past Medical History," see R. 266, 268, 270, 272, 274, 277, 280, 282, 284, 286, 288, 290, 292, 294, 296, 300, 302, 304, 306, 309, 312, 314, 316, 318, 320, 322, 324, 326, 328, 330, 332, 333, there is no record that Clark complained of or was treated for back or knee pain other than a single notation, relating to treatment for a stomach ailment, that reflected Clark was taking ibuprofen for back pain, R. 296.

Clark points to a physical assessment for a "Determination of Employability" that found her to be "permanently disabled," Clark Opp. at *3 (citing R. 542-46); see also Letter at *2. But the assessment was conducted in 2013, see R. 546 — over two years after the date last insured and after Clark's cancer diagnosis and treatment. Clark also draws the Court's attention, see Clark Opp. at *4, to a portion of the hearing in which the ME responded "Yes" to the ALJ's question, "Now after [2010] she does have several severe impairments, correct?" R. 668-69. But the severity of Clark's impairments after December 31, 2010, is not at issue and the ME's testimony on this point does not support Clark's argument.

23

In her July letter to the Court, Clark listed a number of other pages from the record that she believes support her case. See Letter at *2 (citing R. 657-73, 668-69, 687-705, 1067, 1405-09, 1479, 1480, 1493-95, 1916-18, 2088-91). But none of these records call into question the ALJ's decision. They mostly consist of portions of the record actually considered by the ALJ, such as the hearing transcript or Clark's hypercalcemia evaluation. Other pages relate to medical treatment in 2014 or later that do not bear on Clark's condition during the relevant time period.

In sum, substantial evidence supported the ALJ's conclusion that prior to December 31, 2010, Clark did "not have an impairment or combination of impairments that significantly limits [her] ability to perform basic work activities." R. 649.

B. New Evidence

As part of her responsive papers, Clark submitted (1) a physical residual functional capacity questionnaire, filled out by Dr. John Galeno and dated January 7, 2019, Letter at *3-7; (2) "Migrated Progress Notes" from November 16, 2007, Clark Opp. at *9; and (3) two x-rays of Clark's lumbar spine, supposedly taken on May 24, 2018, that followed her spinal disc fusion operation, id. at *12-13.

Generally, "evidence not contained in the administrative record may not be considered by a district court when reviewing the findings of the Commissioner." Collins v. Commr. of Soc. Sec., 960 F. Supp. 2d 487, 500 (S.D.N.Y. 2013) (citations and internal punctuation omitted). A district court may, however, remand a case to allow additional evidence to be considered by the Commissioner, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized this three-part showing as follows:

> [A]n appellant must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide [a] claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S., 940 F.2d 40, 43 (2d Cir. 1991) (first alteration in original) (internal citations and punctuation omitted); accord Mauro, 270 F. Supp. 3d at 762.[6]

Furthermore,

> [g]ood cause for failing to present evidence in a prior proceeding exists where the evidence surfaces after the [Commissioner's] final decision and the claimant could not have obtained the evidence during the pendency of that proceeding. To show good cause, the claimant must adequately explain the failure to incorporate the proffered evidence into the administrative record.

Soto v. Colvin, 2015 WL 1726541, at * 26 (S.D.N.Y. April 14, 2015) (internal quotation marks and alterations omitted) (quoting Lisa, 940 F.2d at 43, 45). However, when a plaintiff provides "no reason, much less good cause, for failing to incorporate the new evidence into the record in the prior proceeding, . . . [p]laintiff's request for remand for consideration of new evidence should be denied." Maniscalco v. Colvin, 2015 WL 273689, at *15 (S.D.N.Y. Jan. 22, 2015).

We now turn to each of the new pieces of evidence.

### 1. Dr. Galeno's Residual Functional Capacity Questionnaire

The record contains medical records from 2009 to 2018. Records from 2007 and 2008 were requested, but none were produced. The record includes documents from Clark's primary

---

[6] The "reasonable possibility" concept is included in the current regulations. See 20 C.F.R. § 404.970(a)(5) (requiring a showing that "there is a reasonable probability that the additional evidence would change the outcome of the decision"); accord 20 C.F.R. § 416.1470(a)(5).

care physician and hospital records.  Dr. Galeno's residual functional capacity questionnaire is unquestionably "new" because Dr. Galeno did not fill out the questionnaire until January 7, 2019, see Letter at *3-7, which was long after the ALJ made his decision and just two days before Clark filed the instant action.  It is also the first and only time any physician explicitly relates Clark's symptoms back to the relevant period.  In response to the question, "What is the earliest date that the description of symptoms and limitation in this questionnaire applies?" Dr. Galeno wrote "10/2010."  Letter at *7.  Other material from Dr. Galeno's treatment of Clark is already in the record, but it is outside the relevant time period.  See, e.g., R. 1190-92, 1195, 1205-11, 1303, 1324, 1418, 1422, 1426, 1429, 1430, 1433, 1436, 1438, 1441, 1444, 1446-49, 1626, 1629, 1631-37, 1645, 1653, 1678, 1681, 1704-05, 1719, 1721, 1891, 2098-2000, 2110, 2112, 2156, 2158.

The questionnaire, however, is not material.  We begin by noting that the questionnaire purports to address only the last three months of the relevant period.  More significantly, Dr. Galeno cites no "clinical findings and objective signs" to support his conclusion that Clark had limitations during those last three months.  See Letter at *3.  Additionally, while Dr. Galeno diagnosed pain of the spine and shoulder, id.,[7] Clark's primary reason why she couldn't work during that time was pain in her knees, R. 676.  In light of these facts, there is no "reasonable possibility" that Dr. Galeno's questionnaire responses would have influenced the Commissioner's decision.  The ALJ's decision on the severity of Clark's impairments relied heavily on the notes from Clark's treating physicians at the time, which reported she was feeling

---

[7] Dr. Galeno's report lists diagnostic codes M54.6, M51.26, and S43.429A which represent pain in the spine, disc displacement, and sprain of rotator cuff, respectively.  See ICD10Data.com (Last visited Feb. 24, 2020).

well; Clark's own testimony about her abilities and lifestyle during the relevant period; and the ME's testimony. See R. 645-49. The ALJ considered the fact that the record included a history of osteoarthritis, R. 645, and Clark's testimony regarding her subjective pain, R. 647-49. The ALJ also discounted the assessments in the record from physicians that did not treat Clark during the relevant period. See R. 648. Thus, there is virtually no likelihood that the unsupported conclusions of a doctor who was not treating Clark during the relevant period, which purport to apply to an eight-year period only the last three months of which occurred during the relevant period, and which raise new diagnoses, would have caused the ALJ to rule differently.

### 2. The Migrated Progress Notes

The Migrated Progress Notes ("MPN") consist of a single page of notes from a provider named "Nancy Jenks" who is not otherwise identified. See Clark Opp. at *9. The MPN state that Clark presented with bilateral knee pain, which she had experienced for "one month." Id. The knee showed no "swelling or redness" but Clark reported she had "chronic pain while walking," which was "6-7/10." Id. The assessment is listed as "Arthritis (Type – knee pain)." The MPN are dated November 16, 2007. Id. The MPN appear to be the only record before 2011 in which Clark was assessed as having arthritis. Id.

However, the MPN are not material. First, the MPN bear only minimally on the relevant period given that they precede it by more than a month. While the MPN indicate a plan for a "Radiologic exam," "Orthopedics," and "an appointment tomorrow for CPE" there is no evidence to suggest that Clark was ever again treated for her purported knee pain. Id. Furthermore, the MPN provide no evidence that the pain even continued into the relevant period. As already noted, there is no record evidence that Clark complained of knee pain during the subsequent three years.

Additionally, we cannot say that there is any "reasonable possibility" that the MPN would have influenced the Commissioner's decision. While the evidence from within the relevant period listed a history of osteoarthritis, the ALJ and ME both noted that there was no evidence of osteoarthritis actually affecting Clark during the relevant period, R. 667. This conclusion is not altered by the MPN, which merely state a complaint of knee pain before the relevant time period. Furthermore, the MPN contradict Clark's statements to her physicians during the relevant period that she was doing well. R. 302. As noted, Clark reported being able to walk, stand, drive, shop, do chores, and even go dancing during the time period she claims to have been disabled. See R. 211-19, 671-72.

Finally, Clark's papers provide no good cause explaining why she did not submit the MPN during the prior proceedings.[8]

### 3. The Spinal Images

Clark also submits x-rays, purportedly taken on May 24, 2018, of her lumbar spine following her January 19, 2018, spinal surgery. See Clark Opp. at *6, 11-12. The x-rays are not accompanied by any narrative report and thus could not have had any influence on the outcome of the proceedings. In any event, there is no reason to conclude that the x-rays address Clark's disability during the relevant period between December 31, 2007 and December 31, 2010. Finally, Clark does not explain why she did not submit these images during the two hearings before ALJ Stacchini that took place following the surgery. Thus, even if they were material, Clark had ample opportunity to include the images in the record and failed to do so. Thus there

---

[8] Clark complains of the diligence of her representative because he did not bring records to the initial hearing before ALJ Lebron. 2d Opp. at *2. But Clark still attended three more hearings at which she represented herself and thus had many opportunities to provide any records. Instead, she affirmed to the ALJ that the record was complete. See R. 694.

is no "reasonable possibility that the new evidence would have influenced" the ALJ to decide

that Clark was actually disabled during the relevant time period, Lisa, 940 F.2d at 43, and Clark

has not shown good cause why the additional evidence was not submitted during the prior

proceedings, see Maniscalco, 2015 WL 273689, at *15.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 13) is granted. The Clerk is requested to enter judgment and to close the case.

SO ORDERED.

Dated: March 13, 2020
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy mailed to:

Ava Clark
901 Main Street
Apt. 7K
Peekskill, NY 10566

29